Vincent Johnson and Ethelyn Johnson v. Commissioner.
Johnson v. Commissioner
Docket No. 40599.
United States Tax Court
T.C. Memo 1955-247; 1955 Tax Ct. Memo LEXIS 93; 14 T.C.M. (CCH) 981; T.C.M. (RIA) 55247; August 31, 1955
Vincent Johnson, Esq., 2001 West 21st Street, Minneapolis, Minn., for the petitioners Richard C. McLaughlin, Esq., for the respondent. TURNER
Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined a deficiency in income tax against the petitioners for the year 1948 in the amount of $308.82. By amended answer, respondent has requested that the deficiency be increased to $340.20. There are two questions at issue: (1) whether gains realized from the sale of lots during the taxable year should be treated as ordinary income or capital gains, and (2) whether the payment in 1948 for a survey made in 1946 of certain unimproved lots was a capital expenditure or a deductible expense. Findings of Fact Some *94 of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife, and are residents of Minneapolis, Minnesota. They filed their joint income tax return for 1948 with the collector of internal revenue for the district of Minnesota. Vincent Johnson, sometimes referred to herein as petitioner, is an attorney, and in 1948 maintained an office in Minneapolis. Ethelyn Johnson, during the taxable year, was employed as an executive by John W. Thomas Company, a retail clothing store in Minneapolis. Petitioners employ the cash receipts and disbursements method of accounting and file their returns on the basis of a calendar year. In 1944 or 1945, petitioner had the proceeds from the sale of a parcel of land and Ethelyn Johnson had received payment on an endowment insurance policy that had matured, and they decided to buy real estate near or in Minneapolis. A piece of property that appeared attractive to them was a certain hillside, adjoining a public park, in an area called Laurel Hill. Petitioner purchased the property from the state, which had acquired it by foreclosure of a tax lien. He became acquainted with the employees in the Tax-Forfeited Land Department *95 in the office of the county auditor of Hennepin County and various discussions with them led to and resulted in a series of purchases by petitioner of tax-forfeited lands. Petitioners also acquired properties through the purchase of assignments of taxes, the previous owners selling their rights to petitioners before the date set for foreclosure on the tax liens. In 1945, 1946 and 1947, petitioners purchased from 75 to 80 vacant lots of real estate in and around Minneapolis. Most of the purchases were made in 1946. These lots were in approximately 22 groupings, in which many of the lots were contiguous. Substantially all the purchases consisted of tax-foreclosed properties purchased from the county auditor of Hennepin County. A few purchases were from private parties, usually to square out groups of contiguous lots.
During and after 1948 there were few, if any, tax-forfeited land sales, but petitioners did make a purchase of two lots in 1950. For the years 1947 to 1952, inclusive, petitioners sold at least the number of lots or portions of lots listed below. The number of sales made in each of these years is shown opposite the number of lots sold: Number
Year
Lots Sold
of Sales
1947
1
1
1948
6
5
1949
1
1
1950
11
4
1951
3
2
1952
3
1
*96 The following is a schedule of the properties petitioners sold in 1948: Property
Manner
Date
Item
Sold
Acquired
Acquired
Cost
1. - Lot 1, Block 6, Noko-
mis Knolls, 2d Addition
1 lot
Tax Sale
3- 1-48
$125.00
2. - Lots 1 and 2, Block C,
Plymouth Orchards
2 lots
Tax Sale
6- 9-46
$661.30
3. - Lot 19, Block 37, West
Minneapolis Center
1 lot
Tax Sale
7-24-46
$145.27
4. - West 117 ft. of Lot
1 lot
13, Block 31, Highland
(part im-
Park
proved)
Tax Sale
3- 3-47
$618.08
5. - Lot 13, Block 4,
Thorpe Brothers Grove-
land Shores
1 lot
Tax Sale
1946
$100.00
Date of
Selling
Expense
Item
Sale
Price
of Sale
Profits
1. - Lot 1, Block 6, Noko-
mis Knolls, 2d Addition
7-26-48
$ 250.00
$3.55
$ 121.45
2. - Lots 1 and 2, Block C,
Plymouth Orchards
2-24-48
$1,080.00
$2.10
$ 416.60
3. - Lot 19, Block 37, West
Minneapolis Center
3- 3-48
$ 400.00
$ 254.73
4. - West 117 ft. of Lot
13, Block 31, Highland
Park
1-13-48
$3,100.00
$2,481.92
5. - Lot 13, Block 4,
Thorpe Brothers Grove-
land Shores
8-16-48
$ 260.00
$ 160.00
Item 1 was reported by petitioners as a short-term capital *97 gain and Items 2, 3 and 4 were reported as long-term capital gains. Petitioners did not report the gain realized from the sale of Item 5. Minnesota has the Torrens System, under which a certificate is issued insuring title, after necessary formal steps have been taken to clear it. In Hennepin County, a tax title is not usually considered adequate in transferring real property until the title has been torrensed. Where there is no real contender, which is often the case, it takes an attorney, representing a client, three or four months to obtain a Torrens Certificate. However, the time can be dragged out over a period of a year or two. Petitioner secured a Torrens Certificate on a majority of the properties he purchased at the tax sales, and on all the properties sold by petitioners in 1948. Item 2 consisted of two irregular lots of approximately 4 acres, which ran parallel to some railroad tracks. Melvin Ovestrud became interested in purchasing the two lots when he was unsuccessful in buying property on the other side of the tracks. In the spring of 1947, he obtained petitioner's telephone number from a "For Sale" sign on the property, telephoned petitioner and started negotiations *98 which led to Ovestrud purchasing the lots. Ovestrud engaged an attorney to work with petitioner to obtain a clear title to the lots, and in February 1948, the sale was finally consummated. In 1946, A. P. Berge had an employee who wished to buy the Item 3 property, so as to be near his work, but he had no money with which to make the purchase. Petitioner's telephone number was obtained from a "For Sale" sign on the property and, after telephoning and talking to petitioner, Berge bought the property for his employee, by making a down payment of $50 and paying the balance in 1948, when the deed was delivered. Petitioner learned of the Item 4 property from W. A. Kidder, who worked in the Tax-Forfeited Land Department and had become acquainted with petitioners in 1945 or 1946. Kidder was usually familiar with the properties sold, as it was his duty to inspect them. He told petitioner about the property, which had a residence on it, but at the time petitioners purchased the property Kidder had left the department to start a real estate business of his own. Later Kidder was advised by petitioner that he had purchased the property. Petitioner suggested that Kidder might sell it and that *99 if he sold it petitioner and Kidder would "fifty-fifty, everything you get over what it cost me, we will split." Petitioner was to take the necessary steps to clear the title. Kidder put a "For Sale" sign, with his telephone number on it, in the window of the house, and placed an advertisement in the Sunday newspaper, and through the advertisement the property was promptly sold. Possession of the property was turned over immediately to the buyer, but the title was not cleared and delivered until several months later. On February 27, 1948, at a tax sale held at the county auditor's office, petitioner and Walfred E. Smedberg were interested in, and the only bidders on, Lots 9, 10 and 11, Block 3, and Lot 12, Block 4, Thorpe Brothers Groveland Shores. Petitioner, at a 1946 tax sale, had acquired Lot 13 that adjoined Lot 12, Block 4, which he offered to sell Smedberg after the latter had been successful in buying Lot 12. Smedberg purchased the lot from petitioner and was advised by petitioner that it would take a few weeks to torrens the property. At that time, Smedberg engaged petitioner to torrens the four lots he had just purchased. On August 18, 1948, petitioners executed a deed *100 to Smedberg covering the Item 5 property. Petitioner had a sign painter put some "Keep Off" signs on one piece of property because of a dangerous hole on it which was in or near a path that crossed the property. At the same time he had the painter make some "For Sale" signs, which were to be used in selling his lots. Petitioner attended to matters relating to the purchase and sale of real estate, while Ethelyn Johnson devoted her time to her duties as an employee of the John W. Thomas Company. Petitioners have not improved any of the lots purchased at tax sales, nor have they rented any of such properties. However, they have had architects draw sketches for improving some pieces of property. In 1945, architects drew a sketch of proposed apartment buildings on property petitioners owned at University Avenue and Eleventh Avenue, S.E., for "V. Johnson and J. Noble." The thought was that the apartments could be rented to university students. No buildings were erected, however, and the land was sold. By 1946, petitioners had acquired at the tax sales one plot of contiguous pieces of property that consisted of approximately 2 1/2 to 2 3/4 acres of land. Some of the land had formerly *101 been improved, but the improvements had been abandoned, leaving the remains of basements, cisterns, and a heavy overgrowth of underbrush. Some of it was hilly and rugged. Because of the nature of the terrain, petitioner employed a firm of surveyors to make a topographical survey of the property so as to better determine the use to which it could be put. There was also a requirement by city ordinance that before any improvement could be made on property within the city, a survey had to be made of the property. The certificate of the surveying firm was to "a true and correct plat of a survey of Lots 3, 4, 5, 20, 21, 22, 23, & 24, Block 1, Groveland Avenue Rearrangement except that part of Lot 24 taken for Bryant Avenue and including that part Bryant Avenue vacated." Besides showing the contours of the land and the boundaries of the property, the survey showed the location of various shrubs and trees. Subsequent to the survey, petitioner employed architects to make sketches or drawings of proposed developments of the property, which were based on the topographical survey. Revised drawings were made in June and July, 1947, for "A Clinic" and a "Building for Doctors," a group of doctors *102 and dentists being interested in that development. The property was zoned for residences, and in order to make the improvement, it was necessary to have the property rezoned. Petitioner petitioned the City Planning Commission of Minneapolis for permission to build a "Medical-Dental Clinic" on the property, but after a hearing on the matter the commission, on May 6, 1948, rejected the petition. The surveyor's bill of $138.50 was presented to and paid by petitioner in 1948. On their 1948 return petitioners reported income and claimed deductions, as follows: Income: Ethelyn Johnson, salary
$ 8,539.00
Dividends
156.25
Interest
417.07
Rentals
1,139.51
Short-term capital gain
124.45 [1]
50 per cent of $3,153.25 - net
1,576.62
long-term gain
Gross Income
$11,952.90
Vincent Johnson: Law Office - Total receipts
$5,126.08
Law Office - Total expenses
5,338.30
Loss
(212.22)
Adjusted Gross Income
$11,740.68
Deductions: Contributions
$ 222.50
Interest
315.10
Taxes: Real Estate
$2,890.52
Personal Property
16.30
1947 Minn. Income Tax - V.J.
158.82
1947 Minn. Income Tax - E.J.
201.42
3,267.06
Total Deductions
3,804.66
Net Income
$ 7,936.02
*103 Though petitioner did not itemize his law office expenses of $5,338.50, the only adjustment made by respondent with respect thereto in his determination of deficiency was the disallowance of $138.50, which petitioner had included as a business expense for the cost of the topographical survey. The only other adjustment made by the respondent in his determination of deficiency is his determination that the entire gain of $3,153.25 from the sale of lots is subject to income tax, instead of one-half of that amount, as claimed by petitioners. The lots sold in 1948 by petitioners were properties held by them primarily for sale to customers in the ordinary course of their trade or business. The cost of the topographical survey in question constituted an improvement to the property, and is a capital expenditure. Opinion The first *104 question is whether the gain realized by petitioners in 1948 on the sale of lots represented ordinary income, or gain from the sale of capital assets. Section 117(a)(1) of the Internal Revenue Code of 1939 provides that "the term 'capital assets' means property held by the taxpayer * * *, but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." It is the claim of petitioners that the properties sold by them in the taxable year were acquired as long-term investments, and were not held primarily for sale to customers in the ordinary course of their trade or business, as determined by respondent. Petitioners contend that they were not engaged in the real estate business, because they acquired the properties as long-term investments; that each had a separate business, to which each devoted practically all of his or her time; that they put on no active campaign to promote sales; that the buyers came to petitioner; that the sales in question were very few, representing a small percentage of their holdings; and that they still hold the majority of the properties originally acquired. Ethelyn Johnson had *105 little, if anything, to do with the real estate transactions. It appears that she had a responsible position with a department store, which paid her a compensation of $8,539 during the taxable year and to which position she devoted practically all of her time. Petitioner handled all the details with respect to purchasing, selling and torrensing the properties. Though he argues that he devoted practically all of his time to his law practice, whatever time was necessary to handle the real estate transactions he gave to them. They appear to have been more profitable to him during the taxable year as the facts show he suffered a loss of $212.22 from his law business while he realized a net gain from his real estate operations of $3,277.70. Being a lawyer, petitioner was in a good position, as well as being qualified, to clear or to torrens the titles to the tax forfeited lands he purchased. He had the time, it was within his professional business, it was necessary in event of sale, and it was of minimum expense to him. It is not likely that he did not consider those matters before assembling 75 to 80 tax lots. It may be true that the steps in the procedure of clearing a title are *106 formal, that there usually no bona fide contest and that the steps could be taken in three or four months or over a period extending up to a year or more, but for a majority of the 75 or 80 titles the necessary time had to be given and petitioner had torrensed the majority of the holdings. It was, of course, to his advantage to have merchantable title, as a sale could be more readily made and consummated. Petitioner maintains that by his and his wife's testimony the fact is established that when their properties were acquired, it was their intention to hold them as long-term investments, and he further argues that that fact is corroborated by his statements that many of the properties were assembled in groupings or plots in order for them to be more easily developed and that it was his intention to put improvements on them. He implies that in order for the Court to come to a different conclusion, it will have to disbelieve his and his wife's testimony. Their testimony, of course, must be considered, and even though self-serving, bears some weight, but their statement of a conclusion does not in itself establish that conclusion. It must be determined from all the evidence of record, *107 and that is a determination which must be made by the Court. Petitioner testified that he conducted no active campaign in order to promote sales of his properties, but the evidence is clear that he ordered "For Sale" signs, that he used them, and that they were instrumental in making sales. The evidence further establishes that he ordered and used the signs early in his acquisition of the properties, for in 1946, the year in which he bought most of his tax lots, some of his signs were observed by prospective buyers and two of the sales in question were attributable directly to such signs. The early purchase and use of the signs are indicative of the owner's intention to acquire and hold the properties primarily for sale. Furthermore, shortly after the acquisition of petitioner's one improved tax forfeited property, he placed it in the hands of an agent to sell and gave him the inducement of a profit-splitting share so as to make a quick sale. His agent used a "For Sale" sign on the property and an advertisement in the Sunday newspaper in advertising the property, which resulted in an immediate sale. In one of the other two sales, petitioner solicited Smedberg to purchase from him *108 a contiguous lot to one Smedberg had acquired at a tax sale. This is an instance of a seller knowing where a prospective buyer might be found, where tax forfeited property is concerned, and the same may be true with respect to a prospective buyer looking up the owner of such property. Petitioner, on brief, states that that is what happened in the other sale which resulted in shortterm gain, although there is nothing in the record that reveals the manner in which the sale was negotiated. But this is of little consequence. Petitioner was holding the property for sale, he was willing to sell for a profit, and he sold at approximately 100 per cent profit. Petitioner contends that his claimed intention of acquiring the properties for investment is corroborated not only by his assembling of many of them in groupings or plots in order that they might more easily be improved, but also by certain exhibits he introduced, which, in his opinion, show that his intention upon acquisition was to build improvements on the properties, presumably for the rental income he would receive. One of the exhibits shows merely a sketchy outline or drawing of some proposed apartment buildings that was prepared *109 in May 1945, by architects for petitioner and one "J. Noble." We are not apprised of who J. Noble is, nor what his interest in the "plan" was. The "plan" was not carried out, as the land was sold. We are not impressed that petitioner intended to make the improvement himself. Rather, we are of the opinion that the drawing was for the purpose of aiding in the sale of the land, in depicting one purpose to which the land could be put. The evidence fails to show that petitioner had the money, or could raise it, for making the improvement, or that even if the money was available, he intended to invest it in such a venture. Two other exhibits show similar sketchy drawings of proposed improvements on the property which petitioner and others tried to have rezoned for the particular improvements and were unsuccessful. A group of doctors and dentists were interested in taking part in the development, and again we do not get the impression that petitioner intended to make the improvement himself and to derive therefrom any rentals. We are of the opinion that the drawings were prepared so that petitioner could better show the use to which the land could be put and thereby assist him in making *110 a sale of the land. The fact is that petitioner made no improvements of any kind to any of his properties, though he tried to convey the impression that he had in miind some particular improvement for each of the properties at the time of acquisition. He "intended" to build a home for himself and family, or for his mother-in-law and sister-in-law, on several eral different pieces of property. He "intended" to construct commercial or rental buildings, even on the same properties he "intended" to be homesites. He had "intentions" to improve the properties he was buying, but the one improved property he acquired at the tax sales, which could have produced rental income for him, was immediately put in the hands of real estate agent and was quickly sold at a nice profit to petitioner of $2,481.92. This does not indicate that petitioner was acquiring property with the intention of improving it and holding it as an investment. Between 1945 and 1948, or even thereafter, as far as the record indicates, petitioner did not and has not undertaken to build a home, a commercial building, or any other improvement on any of the properties acquired at the tax sales. His main interest appears to *111 have been to sell when a profit was to be had. We have carefully considered all the testimony and other matters of record, the arguments advanced by petitioner, and the authorities he has referred to on brief, and we have concluded, as we have found, that the real estate sold by petitioner during the taxable year constituted property held primarily for sale to customers in the ordinary course of his business. The other issue involves the deductibility of an amount expended by petitioner in 1948 for a topographical survey of the Groveland Avenue Rearrangement lots, made prior to 1948. Petitioner contends that the amount is deductible under section 23(a)(1)(A) of the Internal Revenue Code of 1939 as an ordinary and necessary business expense. Respondent's position is that the expenditure is not deductible under section 24(a)(2) of the Code and section 29.24-2 of Regulations 111, and must be capitalized. Section 24(a)(2) prohibits the deduction of any amount paid "for permanent improvements or betterments made to increase the value of any property or estate." Section 29.24-2 of the regulations provides that "amounts paid for increasing the capital value * * * of property are not *112 deductible from gross income." Petitioner argues that the survey was not an improvement or betterment of the property because it added nothing tangible to it. The survey was made for the purpose of establishing boundary lines of the property, of ascertaining the topography of the land, and of recording the location on the property of valuable shrubs and shade trees. In the words of petitioner, "the whole purpose of the survey was for the purpose of knowing what" they had. The result of the survey was to meet the requirement of a city ordinance of establishing the boundary lines of the property before starting a proposed improvement on it and to guide petitioner and his architects in determining to what use the property could best be adapted. From the information furnished by the survey, drawings or plans could be, and were, made for the construction of different types of buildings. It was the type of information that has a continuing use. It could be helpful to petitioner, or, for that matter, to a succeeding owner, for further development or improvement of the property, and therefore has a useful life beyond the year in which the survey was made or the year in which the expense *113 of the survey was paid. The cost was not connected with any sale, and was not a current expense. Like the cost of a survey of newly acquired property, it is properly chargeable to capital investment as a part of the cost or basis of the property. Warner Mountains Lumber Co., 9 T.C. 1171; Frishkorn Real Estate Co., 15 B.T.A. 463; Seletha O. Thompson, 9 B.T.A. 1342; Lincoln L. McCandless, 5 B.T.A. 1114; Cf. Louisiana Land and Exploration Co., 7 T.C. 507. We conclude and hold that the $138.50 expended by petitioners for the survey was a capital expenditure and that it should be added to the cost of acquiring the property in connection with which the survey was made and the expenditure was paid. Respondent's contentions are sustained. Decision will be entered under Rule 50. Footnotes
1. Due to mathematical error, petitioners reported $124.45 as short-term capital gain instead of $121.45, and it appears that the error was included in respondent's determination of the deficiency herein. The error was corrected in the Stipulation of Facts filed by the parties, and consideration will be given thereto in the computation under Rule 50.↩